## CHARLES MICHAEL GAUDIO AND JOSEPH PETER BUCCI *v.* STATE OF MARYLAND

[No. 253, Initial Term, 1967.]

456

458

*Decided June 27, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and O'DONNELL, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Francis S. Brocato* and *Joseph S. Kaufman* for appellants.

*Thomas P. Perkins, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edward F. Engelbert, Chief, Retail Sales Tax Division,* and *J. Thomas Clark, State's Attorney for Queen Anne's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On October 10, 1966, appellants were convicted of the felonious transportation of untaxed cigarettes in violation of Maryland Code (1965 Replacement Volume), Art. 81, § 455, as amended, in the Circuit Court for Queen Anne's County, Judge

Thomas J. Keating, presiding without a jury. Each appellant was fined $3,000. Counsel for the appellants on this appeal did not represent the appellants at the trial below.

The only question presented on this appeal is whether there was an illegal search and seizure.

On May 21, 1965, a truck, which appeared to be loaded with lumber, driven by the appellant, Gaudio, and in which the appellant Bucci was a passenger, was stopped by a trooper of the Maryland State Police for a traffic violation of improper passing. As Gaudio was not a resident of Maryland he was informed by the trooper that he had to post bond in the amount of $28. Maryland Code, (1967 Replacement Volume), Art. 66½, § 320-321. The truck was driven by Gaudio under escort of another trooper to Centreville so the bond could be posted. It was parked in front of the Centreville jail when the arresting trooper arrived on the scene. Bond had not as yet been posted. As the trooper walked by the truck toward the appellants, who had gotten out of the truck, he observed that although it appeared to be loaded with two by four pieces of lumber, the overload springs were not down. He looked more closely and saw that the lumber was fastened by a "flimsy bolt just around there for looks they looked like." He went to the back of the truck and discovered that the lumber was actually only the ends of two by fours nailed to a piece of plywood and "then there was no doubt in (his) mind there was a false load on the truck." At this point the testimony of the trooper, admitted without objection, was as follows:

> "I walked back up to the two gentlemen, Mr. Gaudio and Mr. Bucci, and I looked at Mr. Gaudio and I says, "You have cigarettes on that truck, don't you? I know that I said, "You have cigarettes on that truck" and he says, "Yes, Sir." I said, "How many?" He said, "2,000 cartons." I said, Do you mind if I look inside?" He says, "No, Sir. Go Ahead," and started walking back and started taking pins out trying to open the gate for me. The gate, he had trouble getting it open. He tried to wiggle it back and forth, and I said, "I am going to get a hammer to get this out," and I said, "Well, we will have to check in the

jail to see if they have got one," and we all went in the jail and found a pair of pliers in there, and I removed the back and lifted it up, and when I lifted it up I saw a tarpaulin in there with something under it, and I lifted up the tarpaulin and pulled the paper back, each package was wrapped individually with paper. By package I mean a carton, not a small carton, a ten pack carton. I think they come about 24 or 48 to a carton of cigarettes, and they were wrapped individually with brown paper. I tore this off of one carton out there and checked the seals for the State tobacco stamp and they didn't have any stamps on them at all. I then placed them under arrest and advised them of their rights."

It was stipulated that the cigarettes found on the truck, 3,098 cartons of ten packs each, were turned over to the Cigarette Tax Unit of the office of the Comptroller of Maryland and that none of the packs bore a tax stamp. The piece of plywood with the ends of the two by fours nailed to it and six photographs of the truck were admitted in evidence without objection. At the close of the State's case, a motion for a directed verdict of acquittal on the ground that the search and seizure and the arrest that followed were illegal was made and denied. This motion is treated as a motion for judgment of acquittal. Maryland Rule, 755 a. By thereafter offering evidence, the appellants withdrew this motion. Maryland Rule, 755 b.

Gaudio, testifying on his own behalf, said that when the trooper thought he saw something that was not right on the truck, he took the keys and said, "Open the door. You have cigarettes in here." He did not deny that he admitted cigarettes were in the truck. He denied giving permission to search the truck and when the trooper asked him to open the back, said, "I am not going to open anything. I am not opening anything." Whereupon the trooper said, "If you don't open it I will open it," got a pair of pliers or some tool and opened the truck. The trooper then told him he was under arrest. He testified on cross examination that Bucci lived near him in New York but just went along for the ride because Bucci had no

job and he had left Bucci off in Baltimore and picked him up on the way back from North Carolina where he got the cigarettes. He got the money to buy the cigarettes from a man named "Tommy," last name unknown. Bucci took the stand, denied knowing the cigarettes were on the truck, and testified substantially the same as Gaudio except that while Gaudio said he asked Bucci to go with him, Bucci said he asked Gaudio to take him. He also stated the trooper said, "you have got cigarettes in there," and did not deny Gaudio said, "Yes, sir." At the close of all the evidence the motion for a directed verdict of acquittal was renewed and denied. Under Maryland Rule, 755 a, this is again considered as a motion for judgment of acquittal. There was in evidence, by stipulation or introduced without objection, the admission of Gaudio that there were cigarettes on the truck, the untaxed cigarettes and the piece of plywood with the false ends of lumber nailed to it and the photographs showing that the truck had been rigged in such a manner as to give the appearance that it was transporting lumber, while in fact it was transporting untaxed cigarettes in a hidden compartment. The first question is whether this evidence was properly admitted. *Mapp v. Ohio,* 367 U. S. 643 (1961) held that evidence obtained in an illegal search and seizure may no longer be used in a state prosecution, but it recognized that state procedural requirements to raise or preserve the question may still be respected in the case of an alleged violation of the Fourteenth Amendment. *Porter v. State,* 230 Md. 535 (1963) ; *Shorey v. State,* 227 Md. 385 (1962). Maryland Rule, 522 d 2 provides :

> "Every objection to the admissibility of evidence shall be made at the time when such evidence is offered, or as soon thereafter as the objection to its admissibility shall have become apparent, otherwise the objection shall be treated as waived."

In *Porter v. State, supra,* no objection was made to the introduction in evidence of articles that had been stolen until the end of the State's case at which time counsel for the appellee moved that evidence pertaining to the recovery of those articles be stricken, because there was no showing on the part of the

State that there was a valid search and seizure. It was renewed at the conclusion of the entire case on the grounds of illegal search and seizure. The Court of Appeals held that the motions were the equivalent of a motion for judgment of acquittal. Although the defendant contended that the belated motion to strike should suffice as a timely motion, the Court held that since there was no objection to the introduction of the items in evidence at the time they were proffered, but only at the conclusion of the State's case and at the conclusion of the whole case, the defendant knowingly waived his right to question their admissibility on appeal. In *Martelly v. State,* 230 Md. 341 (1963) a motion before trial to suppress evidence was held to be, in effect, withdrawn by the defendant's trial counsel's express waiver of objection to the admissibility of the same evidence when offered at the trial, the Court stating, page 348:

> "It is settled law that when an accused is present in court and represented by competent counsel, he is bound by the actions and concessions of counsel, and that even constitutional rights may be waived in the course of a trial."

A waiver as to evidence illegally obtained operates with full effectiveness and results in the evidence admitted being given the same probative force as if it were competent. *Martin v. State,* 203 Md. 66 (1953). See *Gault v. State,* 231 Md. 78 (1963) in which it was held that where the record does not show any objection to the testimony, or any motion to strike, the matter of the admissibility of the testimony was not properly before the Court in appeal. The Court further said that a motion for a directed verdict at the close of the State's case could hardly be considered a motion to strike, and if so, it came too late. See also *Banks v. State,* 228 Md. 130 (1962). We find, therefore, that the appellants waived their right to object to the admission of the articles introduced in evidence, even assuming, arguendo, that they were seized as a result of an unreasonable search.

Like the cigarettes, the plywood section and the photographs of the truck, the admission was introduced in evidence without objection. The contention on appeal goes to the lack of the con-

stitutionally required admonitions and not to the fact the admission, apart from this, was not voluntary. There was no allegation below nor on appeal that it was the product of force, violence, threats, inducements or promises. Since the appellants did not object to the introduction below on the ground that it was involuntarily made, the question is not properly before us. Maryland Rule, 1085.

When a confession is admitted without objection, an objection cannot be made for the first time on appeal. *Tucker v. State,* 237 Md. 422 (1965). We do not think that the motion for "a directed verdict of acquittal" which, as we have pointed out, under Maryland Rule, 755 a, must be considered as a motion for judgment of acquittal, was timely and sufficient objection for the reasons set forth in the discussion in this opinion with regard to the admissibility of the tangible evidence.

In any event, we do not feel that the search was unreasonable. As the illegal transportation of untaxed cigarettes is a felony under the provisions of Art. 81, § 455 of the Maryland Code (1966 Supplement to the 1965 Replacement Volume), arrests may be made without a warrant, provided that the arresting officer had probable cause to believe that the crime has been committed and that the person arrested committed the offense. Where such arrest is made upon sufficient probable cause, the officer may, as an incident to the arrest, search the motor vehicle operated by the person arrested.[1] See *Johnson v. State,* 238 Md. 528 (1965) and cases cited. In *Graham v. State,* 239 Md. 521 (1965), the Court of Appeals on page 525 quoted *Mulcahy v. State,* 221 Md. 413 (1960):

"* * * [T]he substance of all definitions of 'probable cause' is a reasonable ground for believing that the person about to be arrested is guilty and that 'probable

1. Code, Article 81, § 455 also provides:

"In any case where * * * any peace officer of the State, has knowledge or reason to suspect that any vehicle is carrying five or more cartons of cigarettes * * * such peace officer is authorized to stop such vehicle and to inspect the same for contraband cigarettes. If such vehicle is carrying cigarettes in violation of any provisions of this subtitle, the cigarettes and the vehicle shall be confiscated and delivered to the Comptroller." We deem "reason to suspect" to mean probable cause.

cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.' Moreover, where circumstances make an arrest without a warrant lawful, it is permissible, as an incident to the arrest, to search the person of the suspect and to take into custody and examine the tangible evidence or instruments of the crime, whether upon his person or within his present or immediate possession."

It also quoted 5 Am.Jur.2d "Arrest", Section 48, where it is stated:

"The existence of 'probable cause,' justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved."

In the instant case the trooper observed that the overload springs on the truck were not down. He saw the lumber was secured by a flimsy fastener. On closer inspection it was obvious that the truck was not loaded with lumber but in an attempt to make it appear that it was, the ends of two by fours were nailed to a piece of plywood, making a compartment in the truck in which something could be concealed and transported. The trooper said to the appellant Gaudio, "You have cigarettes in there," having in mind untaxed cigarettes, as he said on cross examination. Gaudio answered, "Yes, sir." These observations of the trooper and the admission by Gaudio gave the trooper reasonable grounds to believe that the felony of transporting untaxed cigarettes had been committed and that the appellants committed it. The observations and admission made an arrest of the appellants for that offense legal and a search of the vehicle valid. By the testimony of the trooper, he placed the appellants under arrest after the search of the truck. In *Cannon v. State,* 235 Md. 133 (1964), the Court of Appeals

pointed out that the question of nonconsensual searches without a warrant prior to arrest was the subject of an annotation in 89 A.L.R. 2d 715, 780 et seq. It said at page 137:

"While the cases are not in accord, the rule we think sound is that it is immaterial that a search of the person preceded his arrest so long as the requisite probable cause to arrest existed and the search is not too remote in time or place."

See also *Hyde v. Warden,* 235 Md. 641 (1964). In this regard we see no distinction, in the instant case, between a search of the person and a search of the truck. Since we have found that the arresting officer had probable cause to believe that the appellants had committed a felony, the search, resulting in the seizure of the contraband, under the facts and circumstances then existing, was not too remote in time or place nor was it exploratory in nature. By his testimony, the trooper did not base the search specifically on probable cause to arrest without a warrant. In *Cannon v. State, supra,* the appellant contended that the search was for the purpose of identity and therefore was not predicated upon probable cause to believe a felony had been committed, but upon curiosity as to the name of the appellant. The Court said, page 136:

"Even if it were conceded the subjective intent was to establish identity only, this would in no way negate the personal knowledge (the officer) had which was legally sufficient to establish probable cause to arrest. The fact that the search resulted in the discovery of contraband in no way precludes the use of that unexpected evidence * * *."

So we think it immaterial that the trooper searched because he felt, if he did, that he had permission to search, and we need not decide whether there was a valid consent to the search in view of our holding that the arrest was legal.

It is inherent in our holding, that the admission of the appellant, Gaudio, that there were cigarettes on the truck, was a necessary element to establish the probable cause for the arrest. The admission was introduced in evidence without objec-

tion and we have found that, since objection cannot be made for the first time on appeal, the question of its admissibility is not before us. See also *Henry v. State of Mississippi,* 379 U. S. 443. But we think that the admission could properly be introduced in evidence even if timely objection had been made. As the trial of the appellants commenced after the decision in *Miranda v. Arizona,* 384 U. S. 436, was rendered on June 13, 1966, the rules of law enunciated therein are controlling if applicable. *Johnson v. New Jersey,* 384 U. S. 719 (1966) ; *Meadows v. Warden,* 243 Md. 710 (1966). It is clear that Gaudio was under arrest for violation of a traffic law at the time the truck was searched and that Bucci was not then under arrest for that offense. It is also undisputed that the police did not use the procedural safeguards set forth in *Miranda.* The Court said in *Miranda,* page 444 :

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In the opinion the Court discussed "custodial interrogation" at great length and the dangers against which the specific procedural safeguards are a shield were more definitively set forth in the discussion explaining the meaning above stated. The four cases decided by *Miranda* shared salient features, among which was "incommunicado interrogation of individuals in a police-dominated atmosphere." The Court referred to the Wickersham Report in the early 1930's and to the "third degree" which flourished at that time and to cases thereafter decided by the Court in which police resorted to "physical brutality—beatings, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions." It found that the use of physical brutality and violence is not relegated to the past or to any part of the country and stated that,

"Unless a proper limitation upon custodial interrogation is achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future." It stressed that the modern practice of in-custody interrogation is psychologically rather than physically oriented so that coercion can be mental as well às physical. It referred to police manuals and texts in which police officers are told that the "principal psychological factor contributing to a successful interrogation is privacy—being alone with the person under interrogation." The Court stated, page 455:

> "From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. * * * [The] very fact of custodial interrogation exacts a heavy toll in individual liberty and trades on the weakness of individuals."

It cited examples of confessions obtained in three cases decided by the Court, observing that the defendants succumbed "in the incommunicado police-dominated atmosphere". In the four cases decided in *Miranda* the Court concerned itself primarily with this interrogation atmosphere and the evils it can bring, and said, page 461:

> "We are satisfied that all the principles embodied in the privilege [against self-incrimination] apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated

setting of the police station may well be greater than in the courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery."

The Court summarized, page 478:

"* * * we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way *and is subjected to questioning,* the privilege against self-incrimination is jeopardized." (emphasis supplied)

It appears, then, that the procedural safeguards must be employed when, (a) an individual is taken into custody or otherwise deprived of his freedom by the authorities, and, (b) he is subjected to questioning. In the instant case, we feel that the appellants were not subjected to questioning within the contemplation of *Miranda.* We do not think that the evils with which the Court was concerned in *Miranda* were present. The appellants were not held incommunicado in an isolated setting in the privacy of an interrogation room in a police station. They were not swept from familiar surroundings into police custody, surrounded by antagonistic forces and subjected to the techniques of persuasion. They were standing on a public street, in the afternoon, beside the truck in which they had been riding, in the presence of one police officer who had arrested one of them for a traffic violation a short time before. They knew that if they posted $28 bail they were free to proceed on their way. Nor were they "subjected" to interrogation. The testimony of the trooper was that he knew he said "You have cigarettes on that truck," to which Gaudio replied, "Yes, sir." The trooper then said, "How many?" to which Gaudio replied "2,000 cartons." The trooper asked, "Do you mind if I look inside?" and Gaudio consented by saying, "No, sir. Go ahead." We see no practice here, such as concerned the Court in *Miranda,* requiring assurance that it be eradicated. The compelling atmosphere inherent in the process of in-custody interrogation was not present. We think that the questions by the trooper as to the cigarettes and the answers by Gaudio did not

amount to a "custodial interrogation" as contemplated by *Miranda*. We feel that *Miranda* is not factually apposite to the instant case and, therefore, does not compel the State to demonstrate the use of the procedural safeguards therein enunciated with regard to the admission of Gaudio. We do not agree with appellants that, under any and all circumstances, *Miranda* protects the accused to the extent that no inquiry at all by the authorities is permissible without prior warning. For us to hold that the admission in the instant case could not be introduced in evidence solely because the procedural safeguards were not employed, would be an extension of *Miranda* which we feel is not compelled by the opinion. We recognize the rationale of *Miranda* and share the concern for justice—the constant and perpetual disposition to render every man, whether innocent or guilty, what is his due. But a balance must be maintained which does justice not only to the accused but also to society. When weighted too much on either side, imbalance occurs and justice is not served.

There was sufficient legal evidence to sustain the convictions. The credibility of witnesses is for the trier of facts to determine and the trial court was under no obligation to believe the appellants. *Duffy v. State*, 243 Md. 425 (1966). It found no difference in Bucci's and Gaudio's participation in the crime. In judging credibility, the trial court may disbelieve exculpatory statements made by a defendant. *Bird v. State*, 231 Md. 432 (1963). The findings of the trial court on the evidence were not clearly erroneous and the judgments are affirmed. Maryland Rule, 1086.

*Judgments affirmed; appellants to pay costs.*