**UNITED STATES of America,
Appellee,**

v.

**Rocco Salvatore LUPINO, Appellant.**

**Nos. 72–1669, 73–1096.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1973.

Decided June 15, 1973.

Jack S. Nordby, St. Paul, Minn., for appellant.

Joseph T. Walbran, Asst. U. S. Atty., Minneapolis, Minn., for appellee.

Before MATTHES, Chief Judge, and MEHAFFY and STEPHENSON, Circuit Judges.

MATTHES, Chief Judge.

Rocco Salvatore Lupino, having previously been convicted of a felony, is in this court on appeal from his judgment of conviction of receiving, on two separate dates, a firearm in and affecting commerce, in violation of 18 U.S.C.App. § 1202(a)(1), and conspiring with Ralph W. Crippen and other persons to cause Crippen to receive a firearm in and affecting commerce in violation of 18 U.S. C. § 371.[1]

---

1. Lupino is no stranger to the courts. In 1959 he was convicted under the Fugitive Felon Act for fleeing with intent to avoid prosecution for kidnapping and murder. He was sentenced to five years and a fine of $5,000. On appeal to this court the conviction was affirmed. Lupino v. United States, 268 F.2d 799 (8th Cir.), cert. denied, 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed. 2d 75 (1959).

In 1960, his § 2255 motion was denied, Lupino v. United States, 185 F.Supp. 363 (D.Minn.1960), and an appeal therefrom was dismissed as frivolous by this court. Lupino v. United States, 285 F.2d 429 (8th Cir. 1960).

In 1964, the Minnesota Supreme Court affirmed a state kidnapping conviction, State v. Lupino, 268 Minn. 344, 129 N.W. 2d 294 (1964), for which he had received a sentence of 2–80 years. Certiorari was denied by the Supreme Court. 379 U.S. 978, 85 S.Ct. 681, 13 L.Ed.2d 569 (1965).

In Lupino v. Tahash, 252 F.Supp. 225 (D.Minn.1966), his petition for writ of habeas corpus was dismissed.

This prosecution has its origin in two indictments returned against Lupino. The first, in two counts, was filed on April 13, 1972. Count I charged that on March 29, 1971, Lupino, having been convicted of a felony, knowingly received a .38 caliber revolver in and affecting commerce. Count II charged the conspiracy above mentioned.[2] The second indictment, filed on June 27, 1972, charged, in language almost identical to Count I of the first indictment, that Lupino received a .38 caliber revolver on November 9, 1971.

The two indictments having been consolidated, the trial commenced before a jury on Monday, September 11, 1972, and terminated on September 19 in a verdict finding Lupino guilty as charged in the two indictments. Prison sentences were imposed as follows: two years on the substantive offense charged in Count I of the first indictment, five years for the conspiracy offense, Count II of the first indictment, and two years on the substantive offense charged in the second indictment, all to be served consecutively to each other for a total of nine years. It was further adjudged that the sentences were to run consecutively to the sentence Lupino is serving on the state charges.

Presented for consideration are these contentions of error:

I

The prosecution failed to prove the requisite interstate nexus;

II

The prosecution failed to prove appellant's knowledge of the interstate nexus;

III-A

The alleged object of the conspiracy, "to cause" a convicted felon to receive a weapon, is not itself a federal offense;

III-B

The participation of both appellant and Crippen was necessary for commis-sion of the substantive offense and therefore neither may be convicted of conspiracy to commit it;

IV

The classification of "felons" under § 1202(a)(1) violates the due process clause of the fifth amendment;

V

The trial court erred in refusing to issue the writ of habeas corpus ad testificandum to produce George Harmon as a witness for the defense;

VI

The totality of the circumstances denied appellant a fair trial.

In order to place the issues in proper perspective, we summarize the relevant facts and, in doing so, briefly describe the individuals who played important roles.

1. Appellant, who, as we have seen, has a history of criminal activities, had been released from the state penal institution and was on parole when the criminal activities here involved were initiated in March of 1971.

2. Ralph W. Crippen, the named conspirator in Count II of the indictment, had received a life sentence for second degree murder committed when he was 19 years old, had served 20 years and was released in November of 1970. He and Lupino were prison acquaintances.

3. Donald Thunstrom, who also had a criminal record, knew Lupino and Crippen.

4. Myrtle Peka, mother of Thunstrom, had been convicted of a felony.

5. Robert E. Rhoades, a former convict, was also acquainted with Lupino and Crippen.

All of the above named were government witnesses and gave damaging testimony against appellant.

According to the uncontradicted testimony of Thunstrom, Lupino had ap-

---

2. The indictment enumerated four overt acts performed in furtherance of the conspiracy.

proached him on March 29, 1971, given him $35 or $40 and instructed him to purchase a gun. In compliance, Thunstrom and his mother, Myrtle Peka, purchased in her name a .38 caliber revolver from the Great North Trading Post, a Minnesota retail establishment. Later that evening, Thunstrom delivered the firearm to Lupino. This transaction is the subject of Count I of the first indictment.

The firearm in question had been manufactured in Germany and shipped to New York. It entered customs in Minneapolis, Minnesota, and did not leave the state thereafter. The subject revolver bore German markings, including the words "H. Weihrauch, Mellrichstadt" and "Made in Germany."[3]

In either late October or early November of the same year, Lupino acting in concert with Crippen, Rhoades, and Bernie O'Donnell planned a robbery of the Bungalow Bar in Minneapolis. In due course, the robbery was scheduled for the morning of November 9. Unknown to the plotters, federal agents and police officers had Crippen under close surveillance throughout the month of November, and therefore observed a number of meetings of Crippen, Lupino and others, as well as suspicious activities leading up to the robbery, although the agents were unaware of the specific criminal objective. On the evening before the day planned for the robbery, Lupino armed Crippen with the .38 revolver Lupino had obtained through the efforts of Thunstrom. Due to an unforeseen circumstance the next morning—an inability to secure a stolen getaway car, the robbery was postponed, and Crippen returned the firearm to Lupino. This delivery was the subject of the second charge of receiving a firearm. The parties were not easily discouraged, however, and after further consultation, the robbery was reset for the morning of

November 16. Lupino again transferred his gun to Crippen. This time, having successfully obtained a stolen vehicle, Crippen and Rhoades completed the robbery. Crippen, armed with the revolver which is the subject of the indictments in this case, during the course of the holdup, shot the owner of the bar in the foot. Crippen and Rhoades absconded in the stolen automobile with approximately $8,000. Shortly thereafter, they and O'Donnell, who also participated in the holdup, divided the loot after paying $500 to the driver of the getaway car. Several hours later, Crippen was arrested while driving home with his fiancee, Sharon Dorn. The revolver used by him in the holdup was lying on the floorboard of the front seat of his car. The officers took possession of it and part of the stolen money.

Sharon Dorn, as a government witness, testified to threats made by Lupino against her and her children if Crippen cooperated with the officers in any prosecution against him.

At his trial, Lupino did not take the stand. In his defense, he presented a number of alibi witnesses to disprove the March 29th receipt of the firearm. More broadly, he attempted to show that the prosecution witnesses were testifying falsely in return for promises of leniency. In support of this claim, several inmates of the Minnesota prison in which Crippen had been incarcerated testified that Crippen had disclosed to them that he had obtained the gun directly from Thunstrom.

We now advert to the six points of error relied upon for reversal and consider them seriatim.

I.

■ We reject without extended elaboration the claim that the government failed to prove the requisite interstate nexus mandated by United States v.

---

3. The government introduced an invoice dated January 31, 1970, showing that the St. Hubert Company of Waseca, Minnesota, had purchased 11 cases of firearms from a German gun manufacturer. The subject revolver was part of this shipment.

Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L. Ed.2d 488 (1971). As shown above the subject firearm was manufactured in Germany, was first transported to New York and then to Minnesota. This clearly proved that the weapon traveled in interstate commerce and satisfies the statute. United States v. Glasgow, 478 F.2d 850 (8th Cir. 1973); United States v. Mancino, 474 F.2d 1240 (8th Cir. 1973); United States v. Brown, 472 F.2d 1181 (6th Cir. 1973); United States v. Giannoni, 472 F.2d 136 (9th Cir. 1973).

## II.

■ Contrary to appellant's contention, the government was not required to prove appellant's knowledge of the interstate nexus. United States v. Wiley, 478 F.2d 415 (8th Cir. 1973); United States v. Crow, 439 F.2d 1193, 1195 (9th Cir. 1971), vacated on other grounds, 404 U.S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 277 (1972); United States v. Bellperio, 452 F.2d 389 (9th Cir. 1971). Compare with United States v. Freed, 401 U.S. 601, 607–610, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), cited with approval in United States v. Wiley, supra; Bryant v. United States, 462 F.2d 433, 435 (8th Cir. 1972); United States v. Quiroz, 449 F.2d 583 (9th Cir. 1971).

## III–A.

Appellant further contends that the conspiracy count of the indictment fails to. state an offense against the United States. The argument advanced is that § 1202(a)(1) does not purport to punish one who "causes" a felon to receive a proscribed firearm.

This ingenious argument, in the final analysis, constitutes a futile exercise in sematics.

■ Beyond cavil the receipt by a felon of a firearm in or affecting interstate commerce is an offense against the United States. By virtue of the federal conspiracy statute, 18 U.S.C. § 371, and decisions too numerous to cite, a conspiracy to commit an offense against the United States is a crime and the conspirators are subject to prosecution and punishment for engaging in the conspiracy. And the commission of the substantive offense and the conspiracy to commit it are separate and distinct offenses. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180. 90 L.Ed 1489 (1946).

■ Here appellant and at least three other individuals, acting in concert and in order to carry out a well planned scheme, caused one of the conspirators to commit the substantive offense of receiving a firearm. Certainly, we would be required to engage in legalistic gymnastics to hold, as suggested by appellant, that the charge—conspiracy by a number of individuals to "cause" one of them to violate § 1202(a)(1)—does not fall within the ambit of 18 U.S.C. § 371. *See and compare* United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L. Ed. 1211 (1915) (holding in effect that individuals not bankrupt are subject to prosecution for conspiring with a bankrupt to conceal assets). *See also* Gebardi v. United States, 287 U.S. 112, 53 S. Ct. 35, 77 L.Ed. 206 (1932); May v. United States, 84 U.S.App.D.C. 233, 175 F.2d 994 (1949).

## III–B.

Lupino phrases his second attack against the conspiracy count in this language: "The alleged object of the conspiracy, Mr. Lupino's causing Mr. Crippen to receive a firearm, necessarily involved the mutual cooperation of both alleged conspirators and neither may therefore be convicted of a conspiracy."

■ As stated above, the commission of a substantive offense and a conspiracy to commit it are two separate and distinct crimes. However, there are instances where a conspiracy charge may not be added to the substantive charge. Thus, an agreement by two persons to

commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to *necessarily* require the participation of two persons for its commission. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1940); Gebardi v. United States, 287 U.S. 112, 121, 53 S.Ct. 35, 77 L.Ed. 206 (1932); United States v. Skillman, 442 F.2d 542, 548 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971); Baker v. United States, 393 F.2d 604, 610 (9th Cir.), cert. denied, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968); Ferina v. United States, 340 F.2d 837, 840 (8th Cir.), cert. denied, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); Wharton's Criminal Law and Procedure (Anderson) § 89, pp. 192, 193 (1957).

Conversely, this exception does not apply when the offense could be committed by one of the conspirators alone. Wharton's Criminal Law and Procedure, *supra* at p. 192.

The exception to the general rule is also limited to cases where the essential participants are the only conspirators. *See* Gebardi v. United States, 287 U.S. 112 n.6, 53 S.Ct. 35, 77 L.Ed. 206 (1932); Reno v. United States, 317 F.2d 499, 503 (5th Cir.), cert. denied, 375 U. S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963); United States v. Figueredo, 350 F.Supp. 1031, 1035 (M.D.Fla.1972); Wharton's Criminal Law and Procedure, *supra* at p. 193.

■ We hold that this case does not fall within the above exception and that the conspiracy count is invulnerable to a successful attack.

First, we are not inclined to hold that the substantive offense of receiving a firearm prohibited by § 1202(a) is of such a nature as to *necessarily* require the participation of two persons for its commission. Conceivably a felon acting alone could receive a firearm. *See, e. g.,* United States v. Giannoni, 472 F.2d 136 (9th Cir. 1973). Secondly, a fatal weakness of appellant's contention inheres in the fact that in this case the active participants, i. e., Lupino and Crippen, were not the only conspirators. The indictment charged that Lupino conspired with Crippen and divers other persons to cause Crippen to receive the firearm in question. The record conclusively demonstrates that at least Rhoades and O'Donnell participated in the conspiracy in addition to Lupino and Crippen. All of the conspirators played an active role in the numerous transactions which culminated in the delivery of the firearm to Crippen by Lupino and the ultimate holdup and robbery of Bungalow Bar.

## IV.

■ Lupino asserts the classification of "felons" in § 1202(a)(1) violates the due process clause of the fifth amendment because it discriminates against a class of persons without a demonstrated rational basis. We upheld the statute against a similar attack in United States v. Synnes, 438 F.2d 764, 771 (8th Cir. 1971). *Synnes* was vacated by the Supreme Court and remanded for further consideration in light of United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). We adhere to the view expressed in United States v. Mancino, 474 F.2d 1240 (8th Cir. 1973), that the remand of *Synnes* resulted solely from our determination that no nexus with interstate commerce need be shown, and that our sustention of the constitutionality of the statute is still viable. *See* United States v. Burton, 475 F.2d 469 (8th Cir. 1973).

## V.

We find no prejudicial error in the failure of the court to issue a writ of habeas corpus ad testificandum to produce George (Joey) Harmon, a prison inmate, as a witness for the defense.

■ The grant of the writ lies within the sound discretion of the trial court. United States v. Goldenstein, 456 F.2d 1006, 1012 (8th Cir. 1972).

■ Here appellant requested three writs in order to secure the presence and testimony of three prisoners confined in the state prison. He claimed two of the prisoners would directly impeach Crippen's testimony, and that the third prisoner, George (Joey) Harmon, would testify that upon his arrest an agent of the State Crime Bureau told Harmon there were "unlimited funds available for informants. . . . All you have to do is give us Mancino or Lupino. . . ." Appellant offered Harmon's testimony to show a concerted effort by law enforcement agents to "get" Lupino.

The court denied the writ on the ground that his proposed testimony was irrelevant. The other two writs were granted.

### VI.

■ Lastly, appellant contends the totality of the circumstances denied him a fair trial. We disagree. We have with painstaking care examined the entire record. Lupino was represented by an able, experienced trial lawyer who made a valiant and determined effort against overwhelming odds to convince the jury of his client's innocence. The trial court took care to safeguard all of Lupino's rights; numerous conferences were held out of the hearing of the jury on objections raised as to admissibility of evidence. As indicated at the outset, the trial was a protracted one, and the relatively small number of claimed errors presented on this appeal attest to the fact that the trial was also fair.

The judgment of conviction is affirmed.